and call the case. Case number 10-0474, People v. Alonzo Perry. You know our rules and you will speak up a little. Yes, Your Honor. Because the mics don't necessarily carry, actually they're just for the taping. So to give everybody the opportunity to hear, I would ask you to speak a little louder. I will speak up. Yes, Your Honor. May it please the Court and Counsel, I'm Robert Markfield and I represent Defendant Appellant Alonzo Perry in this matter. I would like if possible to present my arguments in order of complexity 3-2 and then if there's time perhaps a few points on one. To very briefly set the stage, with some facts to set the stage, the murder of Torrey White occurred on Memorial Day, 2006. Alonzo Perry was taken into custody 44 days later. The next day he gave an electronically recorded interview to police, a crucial portion of which was unfortunately inaudible. However, Detective Danny Stover, who conducted the interview, prepared a written summary report in which he recorded that Perry stated that he was at home with his mother that Memorial Day. At trial, Perry's alibi defense was indeed that he was at home with his mother on Memorial Day. He was helping her move. Perry testified to that effect at trial. So did his mother, Barbara Redman. So did his brother and so was there. In cross-examination of these witnesses, the prosecutor implied that the alibi was fabricated during his mother's jailhouse visits with Perry and that she and these other witnesses, the brother and the aunt's boyfriend, coordinated their story about what Perry was doing that Memorial Day in conversations among themselves and in their own jailhouse visits with Perry. Therefore, to rebut that inference of fabrication, Perry should have been allowed at trial to call Detective Stover to testify about Perry's statement, which was recorded in Stover's summary report, the statement that he was with his mother in order to rebut the implication made by the prosecutor that Perry's alibi was cooked up subsequently to his post-arrest interview. Why don't you discuss, first of all, regarding that, Mr. Markfield, both the, what you consider to be the implication of recent fabrication, number one, and number two, plain error. The implication of the fact of the, I would say, first of all, that the courts have been clear that the prosecutor doesn't have to aggressively confront the defense with a claim of fabrication. It's enough to imply. The implication is enough. And the implication that we are alleging is that after this statement was made in post-arrest visits between the defendant's mother and the defendant and between these other witnesses and the defendant, and when these other witnesses talked among themselves, they got their stories straight. Their story was, oh yeah, this defendant was home with us at the time, that memorial day. What we want is for Perry to be able to rebut that implication of recent fabrication with a claim that he had said before the alleged fabrication took place, he said, I was with my mother. That's what he said to police. And he should have been able to bring that up at trial. So it's, in your view, it's just the cross-examination of the family members about the fact that they met with the defendant at the jail following his incarceration and before his trial that is the implication of recent fabrication that you're alleging? That is part of it. And the other part is that they talked among themselves. The prosecutor asked these witnesses, did you talk to, asked the mother, did you talk to, did you talk to the defendant's brother about what happened that day? Did you talk to the aunt's boyfriend who was also there about what's happened, what happened that day? What's the argument to that effect? The, in closing argument, the prosecutor spoke about, said that all these defense witnesses were family members and they might want to support their, you know, somebody they loved. So I would say that that was, that supported the defendant's claim. That brought out even more the fact that the prosecutor was making this claim of recent fabrication. Now plain error, to invoke the plain error rule when a mistaken trial is unpreserved, the defendant has to show the prong that we're relying on is that the evidence was closely balanced case. This is, at first glance it might not seem so. There was a surveillance tape and there were three eyewitnesses. The surveillance tape was, to deal with the surveillance tape first, it was unreliable. The, the, the person Unreliable in what, what way? First of all, I would say that it was old technology, 2006. It wasn't a digital camera that exists nowadays. Well, I mean, there was a person in there doing the shooting. So why is that unreliable? Because you could, I do not think that you could identify the person, the defend, you could match the defendant necessarily to the, to the picture, to the image on the surveillance tape. Which you're saying is inconclusive. Inconclusive, your honor. Very inconclusive. But you've got five, five different people that saw that video and said that's him. And two of them knew him from the past, plus you have 12 jurors who were comfortable enough unanimously to say that's him. Two, and there was, first of all, there was one non-eyewitness who said, who, who looked at it and identified somebody else. So that's enough to put a little bit of doubt in it. As for the other two eyewitnesses, one was a neighbor named Nellums who, who said, though he had a high and by relationship with the defendant, he never really got a good look at him. The other was a former girlfriend of the victim who was, who was initially, who initially was apparently confused, but later on said, yeah, I, yeah, it's, it's, it's the defendant. So that, that does not, I don't think that pins it down, especially when you consider that the defendant has tattoos on his arms. The video does not depict a shooter with tattoos on his arm. The defendant has, had a scar above his eye that was clearly visible because we But you yourself said that the video wasn't that accurate or whatever. So in all probability, maybe if it isn't the current digital, it wouldn't show those. Yes, Your Honor. And I mean, it cuts both ways. I would say that just based on the video, you could say yes or no, but it is just too inclusive to justify criminal conviction. Certainly it's enough to demonstrate that the evidence was closely balanced for the purposes of invoking the plain error rule of this argument in my next argument. But even if we were to invoke plain error, and even if we were to find that the, this prior consistent statement should have been put in, tell me what else we need to find to be able to reverse and remand. Just that the, the evidence was closely balanced and the defendant was prejudiced by the, by the incorrect application of the law. Here was something that the defendant should have been able to do, defend himself against a prosecutor claim that he's recently fabricated in his alibi. And, and in order to find error, find that the case was, the evidence was at least closely balanced and that the defendant was prejudiced. Now on prejudice, we have an unusual window into the fact that the jury was thinking about the alibi. And the window is the fact that the jury sent back a note to the judge. And what was on the jury's mind, and their one and only note to the judge, it was that they, we would like to, we would like transcripts of the testimony of the defense witness, of the defendant and his mother and his brother. We would like transcripts. Now those transcripts weren't prepared, so the judge had to say, you know, we, we just don't have those. But it is. At the time the defendant was taken into custody, were there prior contacts between he and the police? The. Relating to this incident? Prior contacts. In other words, was he questioned by the police or brought in for lineups before the date of the arrest or anything of that nature? Yes, your, I believe that he appeared in a lineup a few days before. Had he been questioned before? I do not think that the record, I don't recall. You see what I'm getting at? And if you don't, my question is, the, the linchpin of the prior fabrication. Yes. Is that it has to, the prior consistent statement has to have occurred before the motive or in case, in this case, the opportunity to have fabricated existed. To the extent that he had been put in a lineup before, had been questioned before by the police relating to this killing, after all, as you pointed out yourself, the statement didn't occur until 44 days after the, the decedent was killed. There would have certainly have been an opportunity to have discussed alibi with the family members before the date of the interview in the police station. Yes, your honor. And here we go, I believe, to a split authority in the appellate court. Some courts think that in order to invoke this, this, this, this exception, you, a defendant or a witness has to show that not only that there was an allegation of recent fabrication made, but there was also a motive to fabric, that the statement he wants to bring in also rebuts the motive to fabricate. Not just the fact of the fabrication, but also to rebut the motive to fabricate. But regardless of the motive, the, the linchpin of recent fabrication is that the, the recent fabrication can be negated, negated by the fact that the statement, which is prior and consistent, occurred before the reason for letting it come in occurred. Now if, for example, he had been arrested the day of the killing and had no opportunity to have contact with his relatives beforehand, wouldn't you agree that would be a stronger case than a situation where he had stood in a lineup before, and this occurs 44 days after the shooting itself occurred? Yes, your honor. I do believe that that, again, invokes opportunity and motive rather than the Separate, separate concept. Yes, your honor. The prosecutor's questions were to the, to the defense witnesses, did you visit him and did you talk, and did you talk to the other, talk among yourselves? The defendant, when he, he was arrested, he was not taken into custody until 44 days after the event. And at that time, actually, he was interviewed and he gave a kind of incoherent answer. He said, what was I doing? I don't remember. I'll have to check with my mother. So he couldn't have set up the alibi before then because he didn't have it. He didn't think of it. He, when he was interviewed by Stover, he said, they asked him on the tape, what were you doing? He said, I'll have to check with mama. Maybe we were barbecuing, maybe I had a barbecue. It was, it's been so long. Now, now what we're saying is that there was another statement made later on that, that didn't appear on the, on the, on the tape, but it was recorded by he didn't set up his alibi before. Let's spin this out a little further. Yes, sir. Let's assume that at a trial, this prior consistent statement comes in. Yes, sir. Negating the, what you consider to be the implication of recent fabrication. The state would then be able to recross, would they not, on the questions that I have just stated. So we, we miss, in your theory, both the chance to put in the prior consistent statement and the opportunity of the state to confront that with cross-examination, do we not? I do agree with that, your honor. And I think the defendant wanted to, to put in the vernacular, take his chances because he was, he was, he wanted that statement brought in that he had said that he was with his mother and felt that that was important enough to, to, to merit the jury's attention and come what may afterwards. I would say, in a larger sense, and I've touched on this, you know, the ability to rebut recent fabrication, it just goes to the fundamental truth-seeking purpose of a trial. It's a real powerful attack on a witness's credibility to assert that he or she fabricated his story or her story. And what gives that attack its power is the factor of recency. The implication that a reasonable or an honest person would have come forward earlier, would have come forward earlier to give his or her account. Why didn't you say so earlier? If this is true, why didn't you say so earlier? Well, the defendant just wants the opportunity to say, hey, I did say so earlier. I did say so before your, before the, the alleged fabrication that you're, that you're presenting before that happened. Now- I know I've eaten up some of your time. Would you like to address the other two points or, or- Of course. It's up to you. I mean, I'm not trying to direct your argument. Okay. I want to, may I make one final quick point on the last one? In the case of a criminal defendant, it's hard to imagine an exculpatory statement that predates exculpatory motive. So if the, if the court goes with the, with one line of authority, you've got to show exculpatory motive. It's going to cut off the ability of a defendant almost to challenge any alibi statement that was made. Any alibi statement, the prosecutor could come, come back and say, oh, you've recently fabricated it. Of course you did. You had a motive. Okay. Now, moving along to the next issue. This is prosecutorial misconduct. The prosecutor said some very strange things. And I point out, this sounds facetious, but a criminal trial, a murder trial, is not a comedy club. And a prosecutor has to restrain whatever impulse she feels to score points with a jury by ridiculing or demeaning the defense counsel. Not for decorum's sake, but to ensure that the verdict in that criminal trial is a result of a reasonable, reasoned consideration of the evidence, rather than passion and contempt stirred up by sarcastic jokes and put-downs. So it's your position that the State should just stand by and let the defense do and say whatever they want? Should object whenever the, if the, if... No, I'm saying when the defense put their case, when she put on whatever she put on, she was sarcastic and demeaning too. Defense counsel? Well, I would say that that, then the State should object, if that's the kind of defense, any kind of sarcasm on the part of defense counsel justified the extreme sarcasm that was... You list a number of points. I do. Are there one or two that you think that are the most in your... There is. I want to say the most bizarre and also the most prejudicial. And I'm going to start with the most bizarre. Well, does the bizarre factor into it? It does. Are we worried about prejudice? We are. But the bizarre, I think, adds to it and it illustrates why the prosecutor went out of her way. I'm going to guess which one you picked. Yes, Your Honor. Now, prosecutor used defense counsel's just innocuous boilerplate reference to King Henry II of England, who began the common law jury system way back when, meant to show the ancient lineage of this right to a jury system. Used that as a springboard for ridicule about how defense counsel had completely absented herself from the courtroom during the whole five-day-long trial in order to travel back in time in a souped-up DeLorean to spend some time with good old King Henry. A pretty strange statement for a prosecutor to make at trial... But again, what's the harm? I mean, you have at least as much opportunity under this circumstance to think that the prosecutor's being flippant. I don't... I'm having a really hard time... I mean, I can tell you that if I were trying the case and the prosecutor was talking about that rather than the evidence, I guess I'd be happy. But, you know, that would... Tell me how it hurt. I think... I mean, it's almost a question of human nature that you really can't pin it down, but I do believe that... I agree with you there. ...that ridicule and taunting hurts. It stings. It hurts its target, and in this case, it splatters onto the defendant who needs, who the system guarantees, a trial with presumably a reasoned consideration of the evidence by a jury of his peers. But did he not, in his conclusionary statements after making those statements, give you the law which would not have hurt your client, but would have made the jury more aware of what they were supposed to be looking for? The instructions had some corrective impact, but when there were nine statements like this, when it was repeated again and again, I think that the cumulative effect of the error outweighs the corrective instructions. So it would be fair to say that the defense believes that the State and the defense should both be conducting themselves professionally and without ridicule, without humor in a case that is so tragic and so important. This was not a time for joking around. I totally agree with that, Your Honor. Any other precedent where King Henry has been the basis for a reversal? I cannot say that it's ever been the basis for a reversal or ever been said before. This was so bizarre, but I said that it was prejudicial. Bizarre or prejudicial, I'm very sorry. The strangeness of it perhaps had an impact on the jury's thinking and caused prejudice. Now I say that was the strangest, sort of the most eye-catching, but the very worst of the statements listed was the eighth. That's where the State and demeaning defense counsel ventured even further into forbidden territory and trivialized its burden of proof by arguing that it would be unfair to accord the identification errors made by the three eyewitnesses more weight than defense counsel's mispronunciation of names. I guess what's good for the goose is not good for the gander because mistakes can come from that side, the defense side, all the time. But if they're coming from the witness stand during the State's case, during our burden, oh, you must. Then the transcript cuts off because defense counsel objected, and the objection was actually overruled. But what the State did here, what the prosecutor did here that was so wrong was trivialize her burden of proof, and the courts have been very clear that that is forbidden territory. Burden of proof is something that can't be misstated or trivialized by the prosecutor. It is not the equivalent of mispronouncing names. It's something more. Well, she was comparing the fact that there were several misidentifications that were witnesses actually identified a totally different person at some point in the timeline of this case to the fact that the defense attorney just, you know, in speaking at different times during the case called Officer Stover, Officer Stovall, and used close names, close sounding names, but didn't quite get it right. And that, we've all done that. So she was comparing missing who the person was and whether or not witnesses had properly identified the perpetrator with whether or not the defense attorney misspoke herself. Yes, Your Honor, and I think that was a shocking comparison. I mean, here, Your Honor alluded to the eyewitness identifications. Well, you know, two of these eyewitnesses had identified somebody else in a photo array. They had identified somebody else in an array where the defendant's picture appeared. Which were two years older than the actual time when we do. That's true, and that is something to consider. But another thing to consider is that these their error in saying that's why. They said, one of them said, I signed the name of this other person, though I wasn't 100 percent sure. And the other one said, I signed the name of this other person, even though I didn't think it was him. Well, the two occurrence witnesses, Shanika Dillon and Josephine Baker, both had an opportunity in the first photo array to identify the defendant and did not. Both had an opportunity to identify the defendant in the second photo array and both identified somebody else. Both had an opportunity to identify the defendant or anybody in the first lineup and could not identify anybody in the first lineup. Now, it's true the defendant was not in that lineup, and the mistaken identity person was in that lineup. So it wasn't until the second lineup, the fourth opportunity to see this defendant, after having seen him twice before, that they both actually said, oh, yeah, it was him. Is that correct? That is totally correct, and I would just add one more point to that. One of those items And that was also true with Danny Phillips at some point. Is that correct? I actually think that Danny Phillips didn't make a misidentification, but he made some mistakes. He went to the two lineups, and he didn't identify anybody in the first one, which, of course, the defendant wasn't there, and he did identify the defendant in the second lineup. And he made some mistakes in describing the event, things we know were mistakes, because we have the surveillance tape. He said he misstated what the gunman was wearing. He misstated the color of the skin, how dark-skinned the gunman was, and he misstated some very basic facts about how many people were in the car. He was the driver of the car that was on Halsted at the stoplight. Yes, I remember. He saw the crime from his car on Halsted. And in his testimony, he is the one who said that the victim was the driver of the car? Yes, Your Honor, that is what he said. When, in fact, it was Shanika Dillon who was the driver of the car, and the victim was standing slightly outside of the passenger side. Is that correct? He said that the male who was driving was the victim. He said there were only three people in the car. Have you got any more law that you can, or are you at the end of your law argument? Well, I would just, on the law, I would just refer to two cases. Actually, one case, People v. Kidd, which said, I believe, that use of sarcasm is completely unacceptable. So the Supreme Court takes it seriously. Their sort of interpretation of human nature is that this really does have an effect. The flippant remarks, the jokes, the jibes, they are not I mean, I would just say that this comparison between mispronunciation of names by a slightly dyslexic defense attorney and misidentifying the wrong person in a photo array is a shocking comparison and it should not be allowed. Thank you, Your Honor. May it please the Court. My name is Michelle Katz. I'm an Assistant State's Attorney representing the People. I'd like to begin by thanking the Court for the prior extensions of time that were granted for purposes of preparing for this oral argument. Unfortunately, Ms. Magani Wakely, who is the primary author of this brief, still has family medical issues that she has to attend to, so I'm here in lieu of her. And with that, turning to the first argument that the defendant has argued this morning. There are two separate bases for this Court to conclude that the defendant has failed to establish plain error in the Court's denial of defendant's request to recall Detective Stover to testify to the contents of his police report. One of my arguments is premised on the particular facts of this case. The other one deals with the legal issue of the two exceptions which would permit the admission of prior inconsistent, prior consistent statements when a prior inconsistent statement has been admitted at trial. I want to start with the factual piece because it's the People's position that based on the facts of this case, there can be no finding of clear error, no less prejudice. And that's because in contrast to what the defendant has argued in his brief and today it seems to have taken a slightly different spin, there was no question but that the defendant told the police when he was questioned after being taken into custody on the videotape, he put out there that he was with his mother. It's true that he didn't recall initially where he was because until there was a framework that was given to it which was, this was Memorial Day, that at that point he says, he makes a whole number of statements all indicating that he was with his mother. He's not sure if they were barbecuing or what they were doing. He'd have to check with his mother. But there's no question that he said at that initial interview he was with his mother. The only debate and the subject of the prior inconsistent statement which the people, I don't want to sort of dovetail into my second argument, but he, this is a confession. This is a statement of a party opponent. It's not a prior inconsistent statement. That's a term of art. This is a defendant's admission. And he is confronted on cross-examination by the state's attorney with the fact that he never said anything about it being moving day. That's the basis for the impeachment of the defendant by omission with what was not said in that videotaped statement. That he said nothing about moving day. So there's a dialogue that transpires where he's asked, you didn't say anything about it being moving day. He says, no, well, not at that point. She persists. Well, you said it at another point. I mean, you knew you were being videotaped. I didn't really know I was being videotaped, but you tell me I was videotaped. Okay, I was videotaped. Yeah, it should be somewhere in there. Now, it's obviously not in there. What is in there, admittedly, is a portion of the tape that was indicated to be inaudible. So after the defendant has been cross-examined, Ms. Plachek and her partner go to the judge and say, we want to be able to do something here to establish what transpired in that missing portion of the tape. And what we want to do, we've got this police report. Now, this is not called to testify to where in the interview this representation came to, but it's in the police report, no question about it, that the detective writes down that the defendant was with his mother. Now, we don't know, based on the record or lack thereof, what portion of the discussion, if that's just my understanding of it's exactly what the defendant said, if that's just his summation of exactly what was transpired, or in the alternative, if the missing portion is the portion which the defendant was arguing that said I was with my mama. The bottom line is, that was not the prior inconsistency. The fact that he doesn't say it was moving day is in no way aided by the detective's police report. There's a complete disconnect between those two things. And the reason is because the detective's report doesn't say anything about moving? That's right. Wait, I thought that was the report that is missing. No, the report's not missing. Not the typed summary, but the detective's notes from which he wrote the summary was my understanding that from the transcript that the detective's notes that he took by his own hand while he was interviewing the defendant, that those, I'm not sure exactly what term of police language you would use for those. Supplemental police report. That thing, that document, in the transcript, it says it's missing. No. It's not missing. No. The detective Stover has it. There was never any debate as to there being a missing police report. It's in the transcript that it's missing. My understanding of, and I've read the transcript, is that what's missing is a portion of the defendant's statement. Well, there are two things. When I read the transcript, I thought that there were two things that were, let's call them missing just for the sake of discussion. The inaudible part of the videotape and the notes that Detective Stover took from which he wrote his police report, which was the type document that is part of the police record. I have to respectfully disagree with you. That's not my reading. But if that is the correct reading, Your Honor. And it was my understanding that Ms. Plachek wanted to cross-examine him on his recollection of what was actually said when he was taking those handwritten notes. And my understanding is that she wanted to use, she was relying on the notation in the case that he was with his mother to use him to basically rehabilitate the defendant's prior inconsistent statement, again, all having to do with whether or not he was with his mother, which, again, is the people's position, was not a contested fact in this trial. The inconsistency had to do with it being moving day. The omitted portion, all the representations by Ms. Plachek, whether it has to do with not having his notes or having his notes or what was in the supplemental police report or whether there was more, every representation in this case made by defense was that it would, and again in the absence of an offer of proof, that it would show that the defendant had said he was with his mother. There is absolutely no reference to it being moving day. Well, isn't it in the summary of the supplemental report that Stover got from Perry on July 12th? Is what in there, Your Honor? That Perry was with his mother? That's the representation, that he was with his mother, a nondisputed fact. And your point is that that doesn't constitute a prior consistent statement with his trial testimony because there's no reference in the detective's supplemental report to the moving day, which is what he had been cross-examined on. And I rely on the case cited by the defendant to make the point, which is People v. Williams, 1991 case, Illinois Supreme Court, that says that where a witness is impeached by means of a prior inconsistent statement, if a consistent statement does not disprove or explain the making of the inconsistent statement, it's not admissible. It neither disproved nor explained its moving day. There's a complete and total disconnect. Therefore, as a matter of fact, there is no clear error in this case. But also the statement, the second part of your argument is the statement that was played to the jury. Yes. Or he put in there that he was with his mother. It's a nondisputed fact. It's there through his statement, his testimony, his mother's statement. His mother's testimony, his brother's testimony. Yes, but whether it's from the mother or the brother, it was the state's position throughout who made clear to the jury that they didn't credit the credibility of those witnesses. And with respect to that, and that's what the argument seems to have sort of transformed into today, you can't take a claim. Let's say that the people's claim was that those witnesses' testimony was recently fabricated. You can't counter the claim of recent fabrication of a witness with the defendant's statement. The prior consistent statement has to be from the same person who's given the prior inconsistent statement. You don't get to leapfrog and use the defendant's statement to correct or have the jury not believe that the mother's testimony is recently fabricated. There's no law that supports. No, but the mother's testimony was the exact same as the defendant's. Yes. So that really isn't an issue, is it? No, but the way that I perceive the argument today was that because there was a charge by the state that the witnesses, the mother and the brother and the uncle's statements were recently fabricated, that this, the defendant's prior consistent statement, would But really the cross-examination of the relatives was aimed not only at their credibility, but also aimed at destroying the credibility of the defendant. Absolutely. So really, why don't you move on. Okay. The second portion of what I want to discuss is the legal piece of it and the defendant's assertion that there's a split in authority. And the best case, the closest case, the only case involving a defendant, is People v. Grissett, which the First District decided 17 years ago. Now, it's interesting when you look at the body of case law. Like I've said, every Illinois Supreme Court case, and every case other than Grissett, deals with a witness's prior consistent statement. There are two separate parallel lines of law dealing with prior consistent statements. One deals with witnesses' prior consistent statements, and one deals with defendants' prior consistent statements. Because the general prohibition against allowing the use of prior consistent statements stems from two different things. When it's a witness, the philosophical underpinnings have to do with a jury believing what's repeated more often to them, and that we're not going to allow that. The law will not permit that. When a defendant's prior consistent statement is at issue, a defendant's prior consistent statement has been held, and it's in the brief, by every Illinois Supreme Court case that's looked at it, to be inadmissible hearsay. Not because the jury believes what's most often repeated, but because a defendant's statement, when he tries to use it, is a self-serving statement, it's hearsay, and that's because the defendant comes with a motive to testify falsely. And you can't separate a defendant's motive out from the equation, which is what they're trying to do, by bringing themselves under the line of cases that deal with recent fabrication. It's a way of immunizing the defendant from the status that he brings to every interrogation post-offense. And so there's two ways of analyzing it. Is your argument, then, that if the defendant testifies at a trial, and the state accuses him through cross-examination of coming up with that argument, or that story, as it were, recently, even though he had said it previously, he couldn't answer the state's cross-examination by bringing in the prior statement? My position is that the cross-examination drives the analysis of whether or not the prohibition or the bar against allowing those statements will be relaxed. Not because it's a charge of recent fabrication and falls under that line of cases, because there's a whole different inquiry that has to be applied. And I would agree with you that there are situations where it would be permissible. For example, the doctrine of completeness. We can't cherry-pick from a defendant's confession and say... Even if it was not completeness, even if it was a separate interview that the state hadn't brought up, if the defendant says, I was with my friend Fred, and the state's attorney got up there and said, you just cooked that up today. And if he had said to an officer or a detective three months before that I was with Fred, that that couldn't be brought up? No, I'm not suggesting that at all, because we cannot affirmatively mislead the jury or alter reality in such a way as to defeat a defendant's right to present a defense or his right to due process. If we're silly enough to ask an open-ended question that says, you never in all of your discussions with the police ever said what you're saying right now, it's fair game. So the bar is going to be relaxed. In your view, you can suggest and imply recent fabrication and be insulated from the defendant proving that it wasn't recently fabricated. Here's the problem that I'm having with it conceptually. I don't think that when you're talking about a defendant's confession, because let's backtrack a little bit and think about what this means. A prior inconsistent statement, which would be subject to rehabilitation via a prior consistent statement, requires that the declarer take the stand. They're subject to cross-examination. They have to have been shown to have made the statement. This is a confession. This judge didn't appreciate that because he ruled initially the state can't put this in because it's not a confession and it's not an admission. We know that that's wrong. It's party admission. We didn't have to confront him with it. We could have put it in without him. So if we had proceeded in that manner, which we would have been entitled to do, not cross-examine the defendant, not confronted him with it, he wouldn't be able to put in. It's like when there's an investigation and a defendant starts off by saying, I wasn't there, and then he says something that's a little more incriminating, and then it grows. He doesn't get to take the stand and testify to all of those statements that he made along the way and say those are prior consistent statements. Not unless there is some reason such as the implication of prior fabrication. My position is certain questioning by the state could trigger admission of that evidence. But it's not because he made it the day before. It can't avoid an analysis of whether or not what his motive is and what his motive was at the time. And whether he had all of those things. To bring it back to a question you asked. I don't want to belabor the point. So for both of those reasons, the people would maintain that there's no clear error here. And also I just do want to say at the end of the day, People v. Kenyatta White instructs that when you're looking at a forfeited claim,  there is no way for the defendant to overcome that burden when you have everybody testifying that he was with his mother. The alibi is perfected to the extent that there's a problem with the alibi. It's not because he didn't have an opportunity to say I said this to the police earlier. It's because of the inconsistencies in the testimony of those witnesses. And I don't know if you'd like me to address the other issue. I think you're good. I'm good? Okay. For these reasons and those articulated in the people's brief, we'd ask that you affirm the defendant's conviction. Thank you. Thank you, Your Honor. Very briefly, did the defendant say when he was interviewed by Stover that he was with his mother? If so, perhaps the problem would be lessened. But actually, the defendant kind of spoke very imprecisely and unclearly and didn't really know what he said. This is on the tape. When he was asked about his whereabouts on Memorial Day, sorry, did you say Memorial Day? But let's see, did my mom have barbecue? I'm not sure. I was probably at the house playing basketball. So that's what he said and what the transcript shows. The interrogators pursued, what were you doing? That is where, unfortunately, the tape cuts off at that crucial point. What did he say? It's pretty important to know. Detective Stover's notes say he was with his mother and that supports, that rebuts recent fabrication, this idea that the prosecutor was saying, that the family members had subsequently visited him and coordinated their alibi. Wait, did Detective Stover's notes say he was with his mother or with his mother moving? He said with his mother. It is a question, I guess, is with his mother consistent, I was with my mother moving, I was with my mother, I was with my mother moving. I would say that the second is consistent, just more detailed. It doesn't contradict, it's congruous, it's just more detailed. We've heard that in the evidence. My point is it doesn't seem to really matter whether that came in or not. He said he was with his mother. He said he was with his mother and the prosecutor came back with these questions implying that, oh yeah, you cooked up that story when you were visited by your mother and when your mother talked to these other witnesses. It's the time factor that matters, not the content. We want to say this statement was made before the allegation of recent fabrication. And I do really think that this is consistent. I would say just flippantly an image that popped into my mind is saying, I had dinner, later on saying I had dinner and ate a salad. Now those two statements are consistent, just be a slightly more detailed and similarly saying I was with my mother helping her move is slightly more detailed. Do you think this would make a difference to an average juror? Don't you think a juror wouldn't get that deep and would make their decision on the fact that they heard several times he was with his mother and they have to weigh whether they believe that's credible or not, that they don't care about the other two words or three words? I would say so. That's right, they do not care about the other three words. So it's in effect not relevant. In effect it's consistent. Yes, but you're giving him credit for being consistent by saying he's with his mother. But I don't think that he got that credit because he was not. Because he wasn't given the benefit of showing that he didn't fabricate it. Exactly, Your Honor. The moving part of it. Yes. And, indeed, I would say again that he was not clear when he was asked that question. In the interview, what were you doing? Oh, he sort of flumpered around. Sorry, did you say Memorial Day? Let's see, did my mom have barbecue? I'm not sure. I was probably at the house playing basketball or something. Maybe you can tease out like a consistency, but I really don't think so. I think that that was, it sounded like an evasive, unclear answer. And we want to show that later on in that interview when it clicked in his mind, when he said it clicked in his mind, he said clearly,  And he should have been allowed to do that to rebut the claim of recent fabrication. We don't want to rebut motive. A criminal defendant maybe always has a kind of motive to alibi himself. We want to rebut the actual fact of the allegation of recent fabrication, period. Okay. Thank you very much. Thanks to both sides for very well presenting. We'll take it under advisement. And we won't let the students ask you guys any questions. So the lawyers are excused and we'll turn off the taping at this point. And thank both lawyers.